IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| International Union of Operating Engineers, Local 150, AFL-CIO, ) ) ) Plaintiff, ) ) ) Case No. v. ) ) Judge: Adamo Demolition Company, a joint ) Magistrate Judge: employer of E Connect, Inc., ) ) Defendant. ) | |

## COMPLAINT

Plaintiff International Union of Operating Engineers, Local 150, AFL-CIO (hereinafter, "Local 150" or "Union"), brings this action to enforce an arbitration award entered against Defendant Adamo Demolition Company, a joint employer of E Connect, Inc. ("the Company" or "Adamo"). In support, Local 150 states as follows:

### Count I

1. This Court has jurisdiction over this action pursuant to Section 301 of the Labor-Management Relations Act (LMRA) of 1947, 29 U.S.C. § 185.

2. Local 150 is a labor organization representing employees in an industry affecting commerce within the meaning of Sections 2(5), (6), and (7) of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 152(5), (6), and (7); and Section 301 of the LMRA, 29 U.S.C. § 185. Its principal offices are located at 6200 Joliet Road, Countryside, Cook County, Illinois, within the geographic jurisdiction of this Court.

3. Local 150's occupational and territorial jurisdiction covers construction and demolition work throughout the greater Chicago, Cook County, and suburban counties of northeast Illinois.

4. The Company is a corporation and an employer in an industry affecting commerce within the meaning of Section 2(2), (6), and (7) of the NLRA, 29 U.S.C. §§ 152(2), (6), and (7); and Section 301 of the LMRA, 29 U.S.C. § 185. The Company's principal offices are located at 320 East 7 Mile Road, Detroit, Michigan.

5. Adamo is signed to a collective bargaining agreement known as the National Maintenance Agreement ("NMA") between the International Union of Operating Engineers ("IUOE") and the National Maintenance Agreements Policy Committee, Inc. ("NMAPC") (Exhibit A).

6. In late 2018 and early 2019, the Ford Motor Company began preparing for a $1 billion renovation of its manufacturing plant located on Torrence Avenue on the southeast side of Chicago. Longtime home of production of Ford's four-door Taurus sedan, the Company planned to retool the plant in order to produce Ford and Lincoln sport utility vehicles (SUVs). While the existing building structures remained intact, the project involved demolition of the Taurus assembly lines and installation of 500 truckloads of new equipment including 600 robots (*see* Exhibit B).

7. On February 15, 2019, Adamo sought and received approval from the NMAPC to perform the Chicago Ford plant demolition under the NMA (Exhibit C). The NMA allows employers to travel across the country to perform construction and demolition work without signing the local collective bargaining agreements ("CBAs") negotiated by local unions and employers in any given geographic area. Such employers are, however, required to pay employees the wage and fringe benefit rates applicable to the work and honor various other terms under the local CBAs.

8. Hence, in the case of the Chicago Ford plant demolition, Adamo was not required to sign the Local 150 Heavy, Highway and Underground Agreement which covered that work. Nevertheless, it was required to honor the wages, hours, and working conditions established by that agreement. Adamo was also required to follow the rules of the IUOE in transferring employees from one Local Union to another.

9. At 6:00 a.m. on Monday, March 4, 2019, work on the demolition of the Chicago Ford plant equipment began. The project called for two 12-hour shifts each day and was projected to be completed in seven days.

10. The demolition of the old Ford Torrence Avenue production lines and the loading of the scrap metal described above was performed in part by approximately 100 Operating Engineers from IUOE Locals 150 and 324 employed by Adamo.

11. After completing the Ford Torrence Avenue plant demolition project, Ford Motor Company sent the NMAPC a letter thanking it and the trades union members involved "for the excellent job you and your staff have done over the past year to support the planning and execution of the 2020 Explorer changeover at our Chicago facilities" (Exhibit D). In particular, Ford pointed out that the project involved demolition and removal of "over 12,000 tons of scrap, with a loaded truck leaving every 90 seconds" and was "completed on-time to support the launch schedule" (*id.*).

12. As the Ford demolition project came to a conclusion, Adamo began to lay off its operating engineer employees as planned beginning the evening of March 6, 2019, and continuing through March 15, 2019. It failed, however, to pay those laid-off employees properly under the NMA, the Local 150 CBA, and applicable policies and practices. Most employees did not receive their checks until March 9, and some not until as late as March 20, 2019.

13. Article VI of the NMA states (Ex. A at 10-11):

**ARTICLE VI - GRIEVANCES**

1. Except for jurisdictional disputes and those involving general wage rates, all disputes and grievances arising out of work performed under this Agreement involving the meaning or interpretation of any provision in this Agreement, or involving the meaning or interpretation of any provision in any other agreement incorporated by reference in this Agreement shall be resolved in the following manner:

- a. All grievances shall be filed within ten (10) calendar days after the complained of event arose. Grievances shall be appealed to steps two (2) and three (3) within ten (10) calendar days after the meeting in the lower step. Settlement of grievances may be made at any step of the grievance procedure and shall be final and binding on the Union and Employer.

**Step 1.** Between the Employer's Supervisor and the Local Union Steward at the job site.

**Step 2.** Between the Business Representative and the Employer's Supervisor at the job site.

**Step 3.** Between the International Union Representative and the Supervisor or Labor Relations Manager.

**Step 4.** If the parties are unable to settle or resolve any grievance or controversy, the matter shall be submitted to the NMAPC for a decision to become effective immediately (parties should refer to NMAPC Grievance Procedures as amended June 17, 2011, at this step).

**Step 5.** Failure of the NMAPC to reach a decision shall constitute a basis for a submittal of the question by the affected parties to the American Arbitration Association for a binding decision. In such instances, the affected parties to the dispute shall appoint an arbitrator to review the matter and render a binding decision. If the parties are unable to agree upon an arbitrator, the American Arbitration Association shall appoint one. The affected parties to the arbitration shall equally share in the costs, including printing and publication of any record of such arbitration.

- b. The Arbitrator shall only have jurisdiction and authority to interpret, apply or determine compliance with the provisions of this Agreement. Any award of the Arbitrator shall be final and binding upon the Employer and the Union. The Arbitrator shall submit a copy of the award to the NMAPC after the award is rendered.

14. On March 19, 2019, a dispute arose between Local 150 and the Company under the terms of the NMA. Local 150 alleged that the Company had failed to issue layoff checks properly at the end of a shift when employees were laid off as set forth in the NMA.

15. On March 27, 2019, Local 150 and the Company attempted to resolve the dispute at a Step 2 conference pursuant to the NMA (Exhibit E). The parties were unable to resolve the dispute at the Step 2 proceeding. Consequently, pursuant to Step 3 of the contractual grievance procedure, on or about March 29, 2019, Local 150 submitted the grievance against the Company to the NMAPC (*id.*).

16. On June 27, 2019, the NMAPC conducted a hearing into the grievance brought by Local 150 against the Company (Exhibit F). Based upon the evidence presented at the hearing, the NMAPC awarded Local 150 $58,802.08 in lost wages and benefits (*id.*).

17. By letter dated June 28, 2019, the NMAPC informed the Company of its decision and award (Exhibit F). Despite repeated demands by Local 150, the Company has failed and refused to comply with the NMAPC award.

18. On or about July 23, 2019, Adamo unilaterally sought and received a "clarification" concerning its award which stated as follows (Exhibit G):

> **Case II**
> In accordance with NMAPC Policy Decision VIII – 1 "Lay-Off/Termination and Request for Time Extension" (attached), Adamo is directed to use the date of the post mark for calculating hours of compensation owed to the grievants.

19. Rather than paying employees the money owed them pursuant to the NMAPC's June 28, 2019 Award and July 23, 2019 "clarification," on August 14, 2019, Adamo falsely claimed it "owes no further amounts relating to Case #2."

20. The NMAPC based its June 28, 2019 Award in part upon its "Bulletin No. VIII – 1 National Maintenance Agreement" "Subject: Article VIII – Wages" (Exhibit H). There, the NMAPC concluded (emphasis in original):

**Conclusion**

The Committee reviewed the issue and re-affirmed, that layoff/termination is "pay-off."

The Committee determined that employees not receiving **their proper pay** at the time of layoff/termination shall be entitled to receive four (4) hours of compensation (wages and fringe benefits) at the proper straight time rate of pay for each twenty-four (24) hour waiting period or a portion thereof. The Committee also recognized that special circumstances exist relative to overtime hours, weekend work and the remuneration for employees during situations when the Employer's payroll department may be closed. When such instances occur, the checks should be prepared and furnished immediately upon resumption of the first normal business day, and the penalty **shall not apply.**

21. Using the "date of the postmark for calculating hours of compensation owed to the grievants" as the NMAPC "Clarification" states, employees are still owed at least $41,167.20 (*see* Exhibit I).

WHEREFORE, Local 150 prays that the Court enter an order:

A. enforcing the NMAPC award finding the Company in violation of the CBA;

B. compelling the Company to pay Local 150 $41,167.20 in lost wages and benefits for violation of the CBA;

C. awarding Local 150 its costs and attorneys' fees for this action; and

D. awarding such other relief as the Court deems just and proper.

6

Dated: March 19, 2020               Respectfully submitted,

                                    By: /s/ Dale D. Pierson
                                        One of the Attorneys for Plaintiff

Names and Address of Attorneys for the Plaintiff:
Dale D. Pierson *(dpierson@local150.org)*
Robert A. Paszta *(rpaszta@local150.org)*
Local 150 Legal Department
6140 Joliet Road
Countryside, IL 60525
Ph. 708/579-6663
Fx. 708/588-1647