UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 150, AFL-CIO,<br><br>                              Plaintiff,<br><br>      vs.<br><br>ADAMO DEMOLITION COMPANY,<br><br>                              Defendant. | 20 C 1871<br><br>Judge Gary Feinerman |

### MEMORANDUM OPINION AND ORDER

The International Union of Operating Engineers, Local 150, brings suit under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, to enforce an arbitration award entered against Adamo Demolition Company by the National Maintenance Agreements Policy Committee, Inc. ("NMAPC"). Doc. 1. Adamo moves to dismiss the suit under Civil Rule 12(b)(6) or, in the alternative, to transfer it to the Eastern District of Michigan under 28 U.S.C. § 1404(a). Doc. 12. Local 150 moves for summary judgment. Doc. 17. After briefing and argument on the dueling motions, the court ordered supplemental briefs on the question whether it should vacate the arbitration award for lack of definiteness or remand it to the NMAPC for clarification. Doc. 39. The court remands the award to the NMAPC for clarification, and the parties' motions are denied as moot.

### Background

The material facts are undisputed. Local 150 is a labor organization that represents construction and demolition workers in the Chicago area. Doc. 29 at ¶¶ 2-3. Adamo is party to a collective bargaining agreement with Local 150 called the National Maintenance Agreement

1

("NMA"). *Id*. at ¶ 5. The NMAPC administers the NMA and arbitrates disputes arising thereunder. *Id*. at ¶¶ 5, 13.

In early 2019, Adamo won a demolition contract in Chicago and hired members of Local 150 to start work on March 4, 2019. *Id*. at ¶¶ 6, 9-10; Doc. 12 at 4. As work on the project progressed, Adamo laid off employees on a planned schedule from March 6 through March 15. Doc. 29 at ¶¶ 9, 12; Doc. 12 at 5.

### A. Paycheck Timing Dispute

On March 19, Local 150 submitted a grievance to Adamo asserting that it had improperly delayed providing the employees with their final paychecks. Doc. 19 at ¶ 14; Doc. 30-1 at 9-11. The parties agreed that the NMA imposes a penalty of four hours' pay for each day that a paycheck is late, but disputed when the penalty period began and when it ended. Doc. 19 at ¶ 14; Doc. 30 at ¶ 3. As to the beginning of the period, Local 150 asserted that the NMA required Adamo to provide an employee's paycheck at the end of the employee's final shift. Doc. 19 at ¶ 14. Adamo responded that Local 150 directed Adamo at a "pre-job conference" to instead mail an employee's check within 24 hours of the employee's layoff. Doc. 30 at ¶¶ 1-2. As to the end of the penalty period, Adamo asserted that the period ended the day the envelope enclosing the check was postmarked. *Id*. at ¶ 19. Local 150 asserted that penalty period ended the day the employee physically received the check. Doc. 19 at ¶ 14.

Local 150 and Adamo met on March 27 but failed to resolve the dispute. Doc. 29 at ¶ 15. Two days later, Local 150 submitted the grievance to the NMAPC for arbitration. *Ibid*.; Doc. 1-1 at 38-40. Local 150's position at arbitration was that the penalty clock started when an employee was laid off and ended when the employee "received" the check. Doc. 1-1 at 39. Adamo's position was that a paycheck was timely so long as the mailing envelope was postmarked within 24 hours of layoff. Doc. 30-1 at 10. Adamo conceded that, under its

position, six paychecks had been two or three days late, but claimed that it had already paid the required penalties to the employees in question. *Id*. at 11.

### B. NMAPC Decision and Clarification

On June 28, 2019, the NMAPC issued its decision. Doc. 38 at ¶ 12; Doc. 30-1 at 31-32. The NMAPC described Local 150's position as follows: "[T]he local explicitly instructed [Adamo] that paychecks needed to be provided to employees upon layoff, however [Adamo] instead mailed all layoff checks to its former employees." *Id*. at 31. The NMAPC noted Adamo's position that Local 150 had "approved the utilization of certified mail." *Ibid*. The NMAPC then announced its decision in two sentences: "After reviewing all the information submitted, both written and oral, the Subcommittee determined that a violation of the [NMA] occurred and therefore the grievance was sustained. [Adamo] is directed to make the grievants whole in accordance with NMAPC Policy Decision VIII-1 'Lay-Off/Termination and Request for Time Extension'." *Ibid*. The NMAPC did not specify a dollar figure that would "make the [employees] whole." *Ibid*.

Policy Decision VIII-1 is an NMAPC bulletin dated October 22, 2015. Doc. 38 at ¶ 18; Doc. 30-1 at 43-44. The bulletin adopts the rule "that layoff/termination is 'pay-off,'" meaning that "employees not receiving **their proper pay** at the time of layoff/termination shall be entitled to receive four (4) hours of compensation … for each twenty-four (24) hour waiting period or a portion thereof." Doc. 30-1 at 43. As for layoffs occurring after hours or on weekends—when payroll offices are closed—the bulletin provides: "When such instances occur, the checks should be prepared and furnished immediately upon resumption of the first normal business day." *Ibid*. Finally, the bulletin states that "[t]he determination on where checks will be delivered shall be reviewed during the pre-job conference." *Ibid*.

3

Adamo sought clarification from the NMAPC in a letter dated July 3, 2019. Doc. 38 at ¶¶ 13-14; Doc. 30-1 at 36-37. The letter articulated Adamo's understanding that, for employees laid off after hours, "checks are due the first normal business day after layoff." *Id*. at 36. In addition, Adamo sought guidance concerning situations where delivery of a check was attempted but nobody was home to receive it. For those checks, Adamo indicated that it planned to "use the first day of attempted delivery as the date of payment," and asked whether that method was "accurate and compliant with the NMAPC ruling." *Ibid*.

The NMAPC responded with a letter dated July 23, 2019. Doc. 38 at ¶¶ 15-17; Doc. 30-1 at 39. The NMAPC reiterated that its decision was "[i]n accordance with NMAPC Policy Decision VIII-1." *Ibid*. And the NMAPC added this sentence as an attempted clarification: "Adamo is directed to use the date of the post mark for calculating hours of compensation owed to the grievants." *Ibid*. The NMAPC did not say whether "the date of the post mark" marked the beginning or the end of the penalty period.

### C.     The Parties' Interpretations of the Award

On July 17, 2019, after the NMAPC's original June 28 decision but before its July 23 clarification, Local 150 wrote to Adamo demanding payment in line with a remedy calculation set forth in an attached spreadsheet. Doc. 38 at ¶ 5; Doc. 1-1 at 42-46. Local 150 interpreted the original decision to mean that the penalty period began on an employee's layoff date and ended on the date the employee physically received a check. Doc. 1-1 at 45. For example, Juan Cuellar and Michael Hoffeditz were both laid off on March 12, their checks were mailed on March 13, and they received their checks on March 15. *Ibid*. Local 150 took the position that both employees were owed three days' penalty pay, reflecting the period from March 12 through March 15. *Ibid*. Under that interpretation of the original decision, Local 150 calculated a total penalty of $58,802.08 for its members. *Ibid*.

4

On August 14, 2019, after the NMAPC issued its clarification, Adamo responded to Local 150 with its own calculation. Doc. 38 at ¶¶ 7-8; Doc. 30-1 at 46-48. Adamo conceded that checks for employees laid off during business hours should have been mailed that day, not the following day, but it interpreted the clarification to mean that the postmark stopped the penalty clock. Doc. 30-1 at 48. Under that interpretation, Adamo viewed Cuellar's and Hoffeditz's situations as follows: Cuellar's last shift ended on March 12 at 2:30 p.m., during business hours, and Hoffeditz's last shift ended that day at 6:00 p.m., after the payroll office closed; both checks were mailed the next day, on March 13; so, Cuellar was owed one day's penalty pay but Hoffeditz was owed nothing. *Ibid*. And as to all employees, Adamo stated that it owed "no further amounts" beyond the penalties it had already paid. *Id*. at 46.

Local 150 never replied to Adamo's August 14 response. Doc. 38 at ¶ 9. Instead, some seven months later, Local 150 filed this suit. Doc. 1. The complaint alleges a total penalty of $41,167.20, which corresponds to an interpretation of the NMAPC award that Local 150 advances for the first time here. *Id*. at ¶ 21; Doc. 1-1 at 54. Local 150 reads the NMAPC's clarification to mean that the postmark is the beginning of the penalty period, which runs until the employee physically receives the check. Doc. 18 at 7. Under that rule, Cuellar and Hoffeditz both would be owed two days' penalty pay because their checks were mailed on March 13 and received on March 15. Doc. 1-1 at 54; Doc. 18 at 6-7. For its part, Adamo adheres to the view advanced in its August 14 response. Doc. 12 at 12-13; Doc. 28 at 8.

## Discussion

"A court's role in reviewing a labor arbitration award is 'very limited.'" *Ameren Ill. Co. v. Int'l Bhd. of Elec. Workers*, 906 F.3d 612, 616 (7th Cir. 2018) (quoting *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 567 (1960)). "If an arbitrator is even arguably acting within

5

the scope of his authority in interpreting the CBA, his decision will be enforced. This applies even if the 'court is convinced he committed [a] serious error' of fact or law in reaching his decision." *Monee Nursery & Landscaping Co. v. Int'l Union of Operating Eng'rs, Local 150*, 348 F.3d 671, 675 (7th Cir. 2003) (alteration in original) (quoting *MLB Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (per curiam)).

Local 150 and Adamo agree that the NMAPC acted within the scope of its authority in arbitrating Local 150's grievance under the NMA. Doc. 29 at ¶¶ 5, 13. And consistent with the above-cited precedents, both sides agree that the court should enforce the NMAPC's arbitration decision. Doc. 18 at 3; Doc. 28 at 7-8. The parties disagree only over the meaning of the NMAPC's decision and clarification, so the court's only task is to determine what the NMAPC in fact awarded Local 150. The trouble is that the NMAPC's decision and clarification are so ambiguous that it is impossible for the court to complete that task.

Settled precedent allows a court to "remand the case to the arbitrator for clarification" if the arbitral award is "'too ambiguous to be enforced.'" *United Steelworkers v. PPG Indus., Inc.*, 751 F.3d 580, 585 (7th Cir. 2014) (quoting *Bhd. of Locomotive Eng'rs & Trainmen v. Union Pac. R.R. Co.*, 500 F.3d 591, 592 (7th Cir. 2007)); *see also Tri-State Bus. Machines, Inc. v. Lanier Worldwide, Inc.*, 221 F.3d 1015, 1017 (7th Cir. 2000) (holding that because "the district court generally may not interpret an ambiguous arbitration award," such an award "should be sent back to the arbitrator for clarification") (internal quotation marks omitted). Pertinent here, "where the parties cannot agree on the precise amount of back wages and benefits due under a broad make-whole ruling," the court may "send the matter back to arbitration to resolve the confusion." *Int'l Union of Operating Eng'rs, Local No. 841 v. Murphy Co.*, 82 F.3d 185, 189-90 (7th Cir. 1996). That said, such remands are "disfavored," and the court should "enforce an

ambiguous award if the ambiguity can be resolved from the record." *Tri-State Bus. Machines, Inc.*, 221 F.3d at 1017 (internal quotation marks omitted).

In *United Food & Commercial Workers Local 100A v. John Hofmeister & Son, Inc.*, 950 F.2d 1340 (7th Cir. 1991), the Seventh Circuit applied these principles in holding a labor arbitration award too ambiguous to be enforced. The award directed that the employee—who had been reinstated after a wrongful termination—be "made whole" with backpay, but left it "unclear what 'make whole' mean[t]." *Id*. at 1341-42, 1345. There were several possible dates that could have marked the beginning of the backpay period, and neither the arbitrator's decision nor "the pleadings or briefs" cleared up the ambiguity. *Id*. at 1345. As a result, the Seventh Circuit directed a remand to the arbitrator "for clarification of the award." *Ibid*.

Likewise, the NMAPC's "make whole" award here remains ambiguous even considering the entire record. To ascertain the award, the court must know when the penalty period for a late check begins and when it ends. It is impossible, however, to fix those two dates in a manner consistent with both the NMAPC's decision and the fact that it ruled for Local 150.

As for the beginning of the penalty period, the NMAPC's original June 28 decision incorporates by reference Policy Decision VIII-1. Doc. 30-1 at 31. The bulletin, in turn, provides that "layoff/termination is 'pay-off,'" with the only caveat being that if a layoff happens after hours, the employer has until the next business day to "furnish" the check. *Id*. at 43. The NMAPC's adoption of that rule largely aligned with Local 150's position in the arbitration that the penalty period began when an employee was laid off—in other words, that Adamo was required to "issu[e] lay-off checks at the end of a member['s] [last] shift." Doc. 1-1 at 39. And the NMAPC's adoption of the "layoff/termination is 'pay-off'" rule rejected Adamo's position in

7

the arbitration that it had agreed with Local 150 at the pre-job conference that the checks would be sent by certified mail within 24 hours of layoff. Doc. 30-1 at 10-11.

As for the end of penalty period, the court cannot draw any conclusions from the NMAPC's original June 28 decision. Policy Decision VIII-1 states that employees are entitled to four hours' pay for each "twenty-four (24) hour waiting period or a portion thereof." *Id*. at 43. But neither that bulletin nor the original decision identifies when the "waiting period" ends.

The NMAPC's July 23 clarification fails to resolve that ambiguity, and in fact introduces further uncertainty. Adamo's request for clarification sought guidance as to both the start and end dates of the penalty period. *Id*. at 36. As to the start date, Adamo asked the NMAPC to confirm that, for employees laid off after hours, Adamo could "use the first normal business day following layoff as the date the check was due"; as to the end date, Adamo asked if it could "use the first day of attempted delivery as the date of payment." *Ibid*.

The NMAPC's clarification directed Adamo to "use the date of the post mark for calculating hours of compensation owed to the grievants." *Id*. at 39. But the NMAPC did not say whether "the date of the post mark" marked the beginning or the end of the penalty period, thus leaving the ambiguity regarding the end date and creating one as to the start date. That ambiguity cannot be resolved because both possible answers—(1) the postmark date marks the beginning of the penalty period, or (2) the postmark date marks the end of the penalty period— suffer from serious flaws given the backdrop against which the NMAPC issued the clarification.

Local 150 chooses the first answer, asserting that the NMAPC's attempted clarification set the postmark date as the beginning of the penalty period. Doc. 18 at 7; Doc. 40 at 8, 12. To support its view, Local 150 maintains that the NMAPC used "the date of the post mark" as shorthand for "the first business day following the layoffs" because those two dates happened to

8

be the same "in this case." *Id*. at 12. But Local 150's rationale rests on an incorrect factual premise; at least thirteen employees' checks were sent two or more days after their layoffs, Doc. 30-1 at 11, 48, so not every postmark date equals "the first business day following the layoffs." (At arbitration, Adamo identified only six paychecks delayed two or more days, *id*. at 11, but it admitted to seven more in its August 14 letter to Local 150, *id*. at 48.) Moreover, delaying the start of the penalty period until the postmark date would contradict Policy Decision VIII-1, which allows next-day mailing only for after-hours layoffs. *Id*. at 43.

Adamo chooses the second answer, that the NMAPC's attempted clarification set "the date of the post mark" as the end of the penalty period, with the beginning being the moment the employee is laid off. Doc. 28 at 7-8. But as Local 150 correctly observes, that interpretation is difficult to reconcile with the fact that it *prevailed* before the NMAPC. Doc. 40 at 9; Doc. 30-1 at 31. Recall that Local 150's grievance sought the remedy of "wages and benefits for 4 hours a day for every 24 hour waiting period or portion thereof until checks were *received* by individual members." Doc. 1-1 at 39 (emphasis added). And recall that Adamo responded that it owed no compensation if "paychecks were *sent* via certified mail, within 24 hours of the employees' lay off." Doc. 30-1 at 11 (emphasis added). In holding that "the grievance was sustained," *id*. at 31, the NMAPC's original decision surely did not adopt Adamo's proposed rule. And if NMAPC's clarification had adopted Adamo's proposed rule, thereby abandoning its initial decision, then surely the clarification would have said as much.

In sum, the NMAPC's arbitral award—the original decision and the clarification—is inscrutable, leaving completely unclear the rule for determining both the start and end dates of the penalty period. The LMRA does not authorize the court to reinterpret the award to resolve

9

that tension, and so the court must remand the matter to the NMAPC to allow it to clarify its ruling. *See Tri-State Bus. Machines*, 221 F.3d at 1017.

Before concluding, the court addresses Adamo's argument in its supplemental brief that the arbitral award should be vacated under § 10(a)(4) of the Federal Arbitration Act ("FAA"). Doc. 41 at 2. The FAA is "applicable to collective bargaining agreements," though "federal common law created under the aegis of section 301 [of the LMRA] is used to determine any substantive issues that arise in proceedings to vacate or enforce the arbitration award." *Pryner v. Tractor Supply Co.*, 109 F.3d 354, 357 (7th Cir. 1997); *see also Smart v. Int'l Bhd. of Elec. Workers, Local 702*, 315 F.3d 721, 724 (7th Cir. 2002) (explaining that lawsuits arising from labor arbitration are "founded both on section 301 of the [LMRA] … and the [FAA]"). Section 10(a)(4) provides that a district court may vacate an arbitral award "where the arbitrators … so imperfectly executed [their powers] that a … definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). As the Seventh Circuit has explained, § 10(a)(4) "render[s] unenforceable an arbitration award that is … so badly drafted that the party against whom the award runs doesn't know how to comply with it." *Smart*, 315 F.3d at 725.

Local 150 argues that the court may not vacate the NMAPC's award under § 10(a)(4) because § 12 of the FAA sets a three-month deadline for a "motion to vacate, modify, or correct an award." 9 U.S.C. § 12; *see* Doc. 40 at 1-2. The award issued, at the latest, on July 23, 2019, when the NMAPC issued its clarification. Doc. 30-1 at 39. Adamo did not raise its § 10(a)(4) argument until filing its supplemental brief on August 26, 2020, more than a year later. Doc. 41. Given this, Adamo missed the deadline for moving the court to vacate the award for lack of definiteness. *See Murphy Co.*, 82 F.3d at 188 (holding that because the employer "failed to

10

successfully challenge the arbitration award within the requisite 90-day limitation period … the award is now final").

There is no need to decide whether the court could vacate the arbitral award *sua sponte* without regard to § 12's 90-day deadline because that deadline does not apply to a remand for clarification under the LMRA. *See Employers Ins. of Wausau v. El Banco De Seguros Del Estado*, 357 F.3d 666, 670 (7th Cir. 2004) ("It is true that although there is a three-month limit on motions to vacate, modify, or correct an arbitral award, 9 U.S.C. § 12, there is no fixed deadline for a motion to remand for purposes of obtaining a clarification of the award."). And because the court has already decided to remand for clarification, vacating the arbitral award under § 10(a)(4) would accomplish nothing of substance because such a vacatur would necessitate a remand for the NMAPC to reconsider the underlying pay dispute in the first instance. *See MLB Players Ass'n*, 532 U.S. at 511 ("Even when the arbitrator's award may properly be vacated, the appropriate remedy is to remand the case for further arbitration proceedings."). The court therefore remands the matter to the NMAPC for clarification without taking the additional and unnecessary step of vacating the arbitral award under § 10(a)(4).

## Conclusion

The NMAPC's arbitral award is remanded to the NMAPC for clarification. Adamo's motion to dismiss or transfer and Local 150's summary judgment motion are denied as moot.

October 26, 2020

_____
United States District Judge